## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JOSE A. CORTES-DIAZ,**

     **Plaintiffs,**

     **v.**

**MERK SHARP & DOHME D/B/A MERK,**

     **Defendants.**

                **Civil No. 19-1611 (ADC)**

## OPINION AND ORDER

Pending before the Court is defendant MSD International GmbH (Puerto Rico Branch) LLC's ("defendant") motion for summary judgment. **ECF No. 24.** For the reasons explained below, the Court **GRANTS** defendant's motion for summary judgment. **ECF No. 24**.

**I.    Plaintiff's failure to comply with this District Court's Local Rules**

    **A.    Local Rule 56(c)**

As an initial matter, the Court will address plaintiff's noncompliance with Fed. R. Civ. P. 56 and Local Rule 56. Under Local Rule 56(c):

> A party opposing a motion for summary judgment shall submit with its opposition a separate, **short, and concise** statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment… Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain **in a separate section additional facts**, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule. (Emphasis added).

If a party improperly controverts the facts, the court may treat those facts as uncontroverted. *Natal Pérez v. Oriental Bank & Tr.*, 291 F.Supp.3d 215, 219 (D.P.R. 2018). While the district court may "forgive" a violation of Local Rule 56, litigants who ignore the rule do so "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007), *Puerto Rico American Ins. Co. v. Rivera–Vázquez,* 603 F.3d 125, 131 (1st Cir. 2010).

First, the Court notes that defendant's Statement of Uncontested Material Facts ("SUMF" or "statement of facts") is 29-pages long (*see* **ECF No. 25**), yet plaintiff's statement of facts in response (*see* **ECF No. 30**) is 63 pages long. [1] As noted in *Domínguez-Rubio v. Hewlett Packard Caribe BV, LLC*, here, too, the reason for such an over extension "is quite simple[,] plaintiffs' opposing statement fails to comply with this Court's Local Rules, specifically its anti-ferret rule." *Id*., 2015 WL 1538284, at *1 (D.P.R. Mar. 31, 2015).

Second, most of plaintiff's SUMF are far from concise. A substantial portion of plaintiff's SUMF denying or "qualifying" defendant's SUMF are replete with "supplemental information, improper editorialization [or] attorney argumentation." *Id*. As a matter of fact, many of plaintiff's SUMF are a page long, while others extend for several pages. *See, inter alia*, **ECF No. 30** ¶¶ 21, 28, 38, 39, 40, 46, 50, 71, 75, 76,82, 86, 87, 93, 94, 95, 96, 98, 99, 100, 103, 104, 109, 111, 112, 115, 116, 117, 118, 119, 121, 122. Some of them stretch for more than 5 pages. Even more

---

[1] A total of 84 pages with plaintiff's additional statement of facts. *See* **ECF No. 30** at 63-84.

egregious is plaintiff's verbatim repetition of the same arguments cloaked as "statements" throughout the SUMF. *See id*.

Third, plaintiff's "denials" and "qualifications" are, to say the least, hard to follow. Most of plaintiff's denials and all his "qualifications" are elongated paragraphs with irrelevant statements that have no bearing or connection to the underlying proposed fact. Indeed, most of plaintiff's denials and qualifications simply repeat plaintiff's general theory, allegations, and legal conclusions. Thus, plaintiff's SUMF in opposition to defendant's SUMF clearly fails to comply with Local Rule 56(c). Because of plaintiff's deviation "with the standards of Local Rule 56, [the Court] is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Adv. Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, 781 F.3d 510, 521 (1st Cir. 2015)(citations and internal quotation marks omitted).

Plaintiff also failed to comply with the applicable rules in submitting his "additional" SUMF at **ECF No. 30** at 63-81, which consists of a whopping 104 additional paragraphs. Plaintiff overlooked the fact that additional statement of facts are allowed for a clearly stated purpose: to include *additional* facts, not to rehash dozens of defendant's statements in a more convenient way. Indeed, a careful review of plaintiff's additional SUMF reveals they are nothing more than a rehash of defendant's SUMF (**ECF No. 25**) and plaintiff's SUMF in response thereto (**ECF No. 30** at 1-63). Plaintiff's failure to abide by the rules requires the Court to revisit and cross-reference hundreds of statements of facts and ferret through hundreds of pages of exhibits.

B.      Local Rule 5(g)

Most, if not all, of plaintiff's arguments regarding the correct interpretation of Puerto Rico Law No. 4 of January 26, 2017, "Labor Transformation and Flexibility Act," ("Law 4"), 29 PR Laws Ann. tit. 29 §§ 121 et seq. rely on either the "Opinion Secretary of Justice, Hon. Wanda Vázquez Garced, of January 24, 2017, addressed to the Governor of Puerto Rico," and a letter and "Guidelines" issued by the Director of the Puerto Rico Department of Labor and Human Resources. **ECF No. 29** at 8-9. In fact, plaintiff requests that this Court take judicial notice of this documents. However, as pointed out by defendant in its reply, these are not readily available in the English language. Despite the fact that defendant flagged plaintiff's failure to submit certified translations thereof, plaintiff kept silent as to this issue in his sur-reply and, most notably, did not move for leave or an extension of time to comply with Local Rule 5(g).

Pursuant to 48 U.S.C. § 864, "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." Local Rule 5(g) requires that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied by a certified translation into English prepared by an interpreter certified by the Administrative Office of the United States Courts." The United States Court of Appeals for the First Circuit requires strict enforcement of the English language requirement where the untranslated document is key to the outcome of the proceedings. *Puerto Ricans for Puerto Rico Party v. Dalmau*, 544 F.3d 58, 67 (1st Cir. 2008).

Allowing non-English documents would be "at odds with the premise of a unified and integrated federal courts system." *Id.* Therefore, district courts should not consider such documents. *González–De–Blasini v. Family Department,* 377 F.3d 81, 89 (1st Cir. 2004).

## II.    Undisputed Facts[2]

### A.    Defendant's business

Defendant manufactures and distributes a broad range of chemical and pharmaceutical products. **ECF No. 25,** ¶¶ 1-2; **ECF N. 30**, ¶¶ 1-2. It is thus highly regulated by the US Food and Drug Administration ("FDA"), the US Environmental Protection Agency ("EPA"), and other local and federal agencies. *Id.,* ¶¶ 3-7; *id.,* ¶¶ 3-7. Defendant's non-compliance with federal law and regulations, including the FDA's and EPA's regulations applicable to manufacturing of health care and pharmaceutical products, may result in civil and criminal sanctions. *Id.,* ¶ 7, *id.,* ¶ 7.

On May 20, 2002, defendant's Las Piedras, Puerto Rico facility was subject to a Consent Decree of Permanent Injunction sought by the FDA, the purpose of which was to ensure compliance with current Good Manufacturing Practices ("GMPs") at its New Jersey and Puerto Rico manufacturing sites. Among the Consent Decree's terms, the Las Piedras facility operated

---

[2] Aside from those specifically identified herein, the Court draws these facts from the well-pleaded facts asserted in the pleadings and the SUMF submitted by the parties that comply with Local Rule 56. *See CMI Capital Market Inv. v. González-Toro,* 520 F.3d 58, 62 (1st Cir. 2008). Although the court reviewed every statement submitted by the parties, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed. R. Civ. P. 56.

under tightly controlled conditions, was subject to additional layers of regulatory oversight, and had to pay $500 million to the U.S. government. *Id.*, ¶ 9; *id.*, ¶ 9.

Because defendant is highly regulated, it requires its employees to know and strictly comply with GMPs, Good Documentation Practices ("GDPs") and similar regulatory requirements established by the FDA, as well as defendant's Standard Operating Procedures ("SOPs") for manufacturing operations. *Id.*, ¶ 10; *id.*, ¶ 10.[3] Defendant develops, revises and enforces its SOPs, which apply to manufacturing operations and processes, in compliance with GMPs and GDPs, and in order to ensure that its products meet federal standards for quality, safety and purity. *Id.*, ¶ 11; *id.*, ¶ 11.

Plaintiff received copies of defendant's employment policies, including handbooks, and received orientations on such policies, handbooks, and defendant's GMPs, as well as to the role and purpose of the FDA. *Id.*, ¶¶ 25-26; *id.*, ¶¶ 25-26.

**B.      Plaintiff's employment**

Plaintiff was born on December 18, 1958 and began working for defendant on May 2, 1997 until his termination on February 1, 2018. **ECF No. 25** ¶¶ 23-24; **ECF No. 30** ¶¶ 23-24. Plaintiff worked as a pharmaceutical operator at defendant's Las Piedras manufacturing facilities. The last position plaintiff occupied was the position of Senior IPT Operator. *Id.***,** ¶ 28; *id.,* ¶ 28.

---

[3] Plaintiff's "qualif[ication]" is completely irrelevant to the proposed statement of fact. *See* **ECF No. 30** ¶ 10.

The primary duties and responsibilities of the Senior IPT Operator's position are to perform functions intimately associated with the manufacture and packaging of pharmaceutical products, such as extrusion, compression, granulation, coating, blending (or mixing), and dispensing. *Id.*, ¶ 29; *id.,* ¶ 29. The purpose of a Senior IPT Operator's role is to execute the manufacturing functions while ensuring and observing compliance with SOPs, GMPs, GDPs and safety regulations and standards. *Id.*, ¶ 30; *id.,* ¶ 30. As part of his duties, plaintiff also trained other or new pharmaceutical operators in the procedures and unitary operations required. *Id.*, ¶ 31; *id.,* ¶ 31.

As a Senior IPT Operator, plaintiff had to adhere to and ensure compliance with GMPs, GDPs, SOPs and safety standards. He received training on these subjects throughout his employment. *Id.*, ¶ 32; *id.,* ¶ 32. Plaintiff, like every other employee, was responsible for reading, knowing, and complying with defendant's employment policies and rules of conduct. *Id.*, ¶ 34; *id.,* ¶ 34. The Employee Handbook sets forth a non-exhaustive list of improper conduct, offenses and violations that could result in corrective or disciplinary measures or immediate employment termination, including: conduct that puts the integrity of defendant's products at risk, falsification or alteration of any Company document, noncompliance with assigned work, omission of job duties or responsibilities and errors due to negligence or carelessness, violation to established rules of GMPs (and GDPs), Good Clinical Practices and/or Laboratory Practices, and violations to Global Standards of Business Practices. *Id.*, ¶ 35; *id.,* ¶ 35. The Employee

Handbook clearly warns that the application of the available corrective or disciplinary measures against an employee depends on the nature of the offense or violation(s) committed and other relevant facts or circumstances, such as: the seriousness of the offense or its monetary impact; the impact on the business unit or department; impact on defendant's reputation; the employee's motivation or intention; past job performance; the employee's progressive discipline history. *Id*., ¶ 36; *id.,* ¶ 36.

### C.     The October 25, 2017 incident

On October 25, 2017, plaintiff returned to work following a 6-day medical leave of absence. *Id*., ¶ 37; *id.,* ¶ 37. Plaintiff submitted a "medical certificate" to show that he was fit to return to work. The medical certificate did not recommend modifications or restrictions to plaintiff's job functions and duties upon his return, nor inform of any prescribed medications or potential side effects of any such medications. *Id*., ¶ 40; *id.,* ¶ 40.[4] Plaintiff alleges he did not felt "fit" to work by himself because he was medicated. He asked his Group Leader, Juan Resto, to not be left alone while working. *Id*., ¶ 42; *id.,* ¶ 42.

That day, Juan Resto assigned plaintiff and another IPT Operator, Marilyn Ortiz ("Ortiz"), to the cleaning of major manufacturing equipment, specifically, a blender tank called "IBC-014 Bohle bin" ("bin") that had been used in the manufacturing of the prescription medication, Belsomra (Suvorexant). *Id*., ¶ 43; *id.,* ¶ 43. This was not the first time plaintiff was tasked with a

---

[4] Plaintiff's "qualif[ications]" to defendant's statement at ¶ 40 have nothing to do with the proposed fact. **ECF No. 30** ¶ 40.

"major cleaning process." *Id*., ¶ 46; *id.,* ¶ 46.[5] According to SOP 07-244, during a "major cleaning process," the operator is required to remove all product residue and materials used in the previous batch from the equipment, utensils, and accessories. *Id*., ¶ 47; *id.,* ¶ 47. Form 3238, incorporated by reference in SOP 07-244, sets forth the steps that the manufacturing operator (in this case, plaintiff) must follow during the cleaning of a bin. Form 3238 also contains instructions and a cleaning checklist that includes the cleaning, drying, and inspection steps/procedures, among others, as well as blank boxes to fill with the time of completion of each task. *Id*., ¶ 49; *id.,* ¶ 49.

During the morning shift on October 25, 2017, plaintiff and Marilyn Ortiz went inside a washroom to clean the bin. At 12:20 p.m., plaintiff began washing the interior components of the bin. Plaintiff was required to log in Form 3238 the time in which he began each cleaning step. A separate blank space was provided for plaintiff to fill with the time of completion of each step, along with his initials and complete date. *Id*., ¶ 59; *id.,* ¶ 59.

At 12:34 p.m., plaintiff began washing the top cover and interior lid of the bin. Plaintiff completed that step and logged 12:36 p.m. as the time in which he finished it. Plaintiff then moved on to the next step of the cleaning process, documenting 12:38 p.m. as the start time in which he began cleaning the vent component, and documenting 12:40 p.m. as the time he

---

[5] Plaintiff's "qualif[ication]" as to defendant's statement at ¶ 46 has nothing to do with the proposed fact. **ECF No. 30** ¶ 46.

finished that step. *Id.*, ¶ 60; *id.*, ¶ 60. At 12:42 p.m. plaintiff began rinsing the central lid of the

bin, contemporaneously recording 12:42 p.m. as the start time of that step in Form 3238. *Id.*, ¶

61; *id.*, ¶ 61. When Plaintiff finished rinsing the central lid, **he did not contemporaneously**

**document the end time** (hour and minute) of completion of that step in Form 3238, at the precise

time he completed it and before moving on to the next step, drying the bin.[6] *Id.*, ¶ 62; *id.*, ¶ 62.

Plaintiff began the drying process.

On or around 1:00 p.m., an IPT Operations department supervisors, Astra Rodríguez,

stepped inside the washroom where plaintiff was working. By that time, plaintiff had moved on

to drying the bin.[7] *Id.*, ¶ 64; *id.*, ¶ 64. Astra Rodríguez initially observed that the form plaintiff

was working on was missing information (time of completion) in the rinse section. Immediately

after, however, Astra Rodríguez turned her attention to Marilyn Ortiz, who spoke to her about

a scale. *Id.*, ¶ 83; *id.*, ¶ 83.

When plaintiff saw Astra Rodríguez, he "remembered" that he had failed to write down

the end time of the rinsing step in Form 3238. At 1:00 p.m. or later and "after the fact," plaintiff

proceeded to log "12:44 p.m." as the time he finished the rinsing. *Id.*, ¶ 65; *id.*, ¶ 65.[8] In this regard,

---

[6] Although plaintiff "admitted and qualified" this statement of fact, the truth of the matter is that he conceded that he "documented… the washing time… barely minutes after." **ECF No. 30** ¶ 60.

[7] Plaintiff "admitted and qualified" this proposed statement of fact. However, his so-called qualifications do not negate the fact asserted and proposed by defendant. Instead, plaintiff's "qualifications" simply seek to establish that his failure to log the time of completion of the rinsing task, which he admits happened "minutes after," was eventually penciled-in in the proper form. **ECF No. 30** ¶ 63-64.

[8] Plaintiff "admitted and qualified" this proposed fact by making reference to his previous statements in response at ¶¶ 50, 51, 55. However, among those statements in response, plaintiff basically admits defendant's proposed statement of fact. To wit, plaintiff concedes that "[w]hen [he] was drying the bin and sees [Astra] Rodríguez coming,

plaintiff "admit[s] that [defendant's] SOP 01-122 requires that manufacturing data and information be recorded at the time [it] is completed or an observation is made." **ECF No. 30 ¶ 66.** Plaintiff did not notify his superiors of the incident. **ECF No. 25 ¶ 66; ECF No. 30 ¶ 66.**[9]

After exchanging words with Marilyn Ortiz, Astra Rodríguez turned her attention to the document plaintiff was working on. At that moment, Astra Rodríguez noticed that plaintiff had "backdated"[10] an entry to reflect that the rinsing step concluded at 12:44 p.m. *Id.*, ¶ 83; *id.*, ¶ 83. Astra Rodríguez warned plaintiff that his actions could cost him his job. *Id.*, ¶ 79; *id.*, ¶ 79.[11]

## D.     The ensuing investigations

### (i) Quality Investigation

A "quality investigation" was launched on October 26, 2017 in connection to the incident. Thus a "LPO Notice Event Report" was issued. **ECF No. 30 ¶ 69-71; ECF No. 38-1 ¶ 83; ECF No. 25 ¶ 69.** The quality investigation concluded that plaintiff's incident[12] had no impact on the quality of any product or manufacturing process because the cleaning process was repeated later that day and approved. From a quality standpoint, the event was classified as a "minor

---

(around 1:00 p.m.) he noticed and remembered that he had to write down the finished time. He went and put the finished time, but he did not realize what time it was at that moment, as he was involved in something else, he missed it. [Astra] Rodríguez tells [plaintiff] that he couldn't do that and [plaintiff] apologized." **ECF No. 30 ¶ 50.**

[9] Nothing in plaintiff's response at **ECF No. 30** contravenes defendant's proposed statement standing for the proposition that plaintiff did not report his mistake.

[10] Plaintiff admitted this language included in defendant's proposed statement of fact.

[11] Plaintiff's partial qualification of this proposed statement is not supported by a citation or reference to any document or affidavit. **ECF No. 30 ¶ 79.**

[12] Plaintiff admitted defendant's proposed fact ¶ 73 which specifically refers to the October 25, 2017 incident as a "backdating violation." *See* **ECF No. 30** at ¶ 73.

deviation" by defendant's quality assurance specialists. **ECF No. 25** ¶¶ 72-73; **ECF No. 30** ¶¶ 72-73.

### (ii) HR's investigation

Defendant's Human Resources Department specialist, Jesús Domínguez-Maldonado ("Domínguez-Maldonado") and Operations Manager, Pedro Pérez, launched a parallel investigation. *Id.*, ¶ 74; *id.*, ¶ 74.[13] Plaintiff, Astra Rodríguez, and Marilyn Ortiz were interviewed. *Id.*, ¶ 76; *id.*, ¶ 76. These interviews were documented. The interviewees signed notes of the interviews. *Id.; id.* Plaintiff was suspended with pay throughout the Human Resources investigation beginning on October 26, 2017. *Id.*, ¶ 81; *id.*, ¶ 81.

### E.    Plaintiff's disciplinary history

The rules of conduct incorporated in defendant's Employee Handbook prohibit falsification or alteration of any of defendant's document, as well as violations to the established rules of GMPs and GDPs. *Id.*, ¶ 86; *id.*, ¶ 86.[14] They also warn that employee's noncompliance with such rules may result in corrective or disciplinary action including employment termination. *Id.*

Before October 25, 2017, plaintiff had been warned and admonished for violations of company policies, including GMPs and GDPs. *Id.*, ¶ 87; *id.*, ¶ 87. Specifically, on May 16, 2003,

---

[13] In his response SUMF to this particular statement of fact, plaintiff only contests the nature of the violation (*i.e.* whether it is a backdating violation or not).

[14] Plaintiff's response does not negate the statement of fact proposed by defendant. **ECF No. 30** ¶ 86.

plaintiff received an "Admonishment" for violations to GMPs, manufacturing regulations and Standard Operating Procedure (SOP). *Id*., ¶ 92; *id.,* ¶ 92. Plaintiff also received a "Written Admonishment" dated April 29, 2005 for violations to the employer's manufacturing instructions, as established in the company's manufacturing procedures and registrations, the GMP, manufacturing regulations and the Employee Handbook. *Id*., ¶ 91; *id.,* ¶ 91. On March 3, 2008, Plaintiff received a "Verbal Admonishment-Deviation" as the result of two incidents in which he deviated from the GMPs, GDPs, manufacturing regulations and Standard Operating Procedures, including SOP-07-075 and SOP-07-180, on two occasions during the manufacturing production of pharmaceutical products. *Id*., ¶ 90; *id.,* ¶ 90. On May 29, 2015, plaintiff received a "Verbal Warning-Human Errors" based on a sequence of four incidences he incurred in during the manufacturing production of product called Janumet XR. *Id*., ¶ 89; *id.,* ¶ 89. On July 22, 2015, plaintiff received a "Written Admonishment-Human Errors" based on his deviations from GMPs, manufacturing records, regulations, and operating procedures in the manufacturing process of Janumet XR on July 15, 2015. *Id*., ¶ 88; *id.,* ¶ 88.

With every disciplinary action, plaintiff was warned that future incidents, errors or violations to defendant's policies and rules would result in the application of disciplinary actions under defendant's discipline policies, up to and including termination from employment. *Id*., ¶ 93; *id.,* ¶ 93.

### III.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83 (1st Cir. 2016) (citations omitted); *see* Fed. R. Civ. P. 56(a). Although the Court states the facts in the light most favorable to the party against whom summary judgment is entered, the Court is still required "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

In order to defeat a properly supported motion for summary judgment, the non-moving party must set forth facts showing that there is a genuine dispute for trial. *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). "When a non-moving party fails to file a timely opposition to an adversary's motion for summary judgment, the court may consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion." *Pérez-Cordero v. Wal-Mart Puerto Rico*, 440 F.3d 531, 533–34 (1st Cir. 2006) (citing *NEPSK, Inc. v. Houlton*, 283 F.3d 1, 7–8 (1st Cir. 2002)). The Court must still scrutinize the summary judgment motion under the terms of the Federal Rules of Civil

Procedure but, "[i]n most cases, a party's failure to oppose summary judgment is fatal to its case." *Id.* at 534.

L. Civ. R. 56(c) states, in pertinent part, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." *Id*. As discussed herein, plaintiffs' opposing statements are replete with supplemental information in clear violation of applicable rules. *See Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 57 (1st Cir. 2011) ("Local Rule 56 is in service to Federal Rule of Civil Procedure 56.").

Moreover, L. Civ. R. 56(e) provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. . . The [C]ourt shall have no independent duty to search or consider any part of the record not specifically referenced by the parties' separate statement of facts."

## VI.    Discussion

This action was removed by defendant on diversity grounds. **ECF No. 1**. Plaintiff claims he was wrongfully terminated from his employment at defendant's facilities in Las Piedras.  **ECF No. 1-1**. According to defendant's motion for summary judgment, plaintiff complaint includes claims under: (1) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., (2) Puerto Rico Law No. 80 of May 30, 1976 ("Law 80"), (3) P.R. Laws Ann. tit. 29 § 185a et. seq.,

and Puerto Rico Law No. 100 of June 30, 1959 ("Law 100"), P.R. Laws Ann. tit. 29 § 146 et. seq.

**ECF No. 24** at 1-22.

### A.      ADEA

Plaintiff admits in his response that he did not properly plead a claim under ADEA in the complaint. **ECF No. 29** at 23-24. He also concedes he did not exhaust administrative remedies and, thus, "has no objection to the dismissal of the action under ADEA." *Id*., at 24.

Accordingly, plaintiff's claims under ADEA are hereby dismissed with prejudice.

### B.      Law 4

The parties quarrel over the application of Law 4's amendments to plaintiff's claims. To wit, defendant argues that, under Law 4 it no longer bears the initial burden to show that the dismissal was not without just cause. **ECF No. 24** at 2-3. On the other hand, plaintiff claims Law 4 explicitly states it does not apply to employees hired before its enactment, and even if it did, Law 4 did not eliminate the "presumption" in favor of the employee and the burden-shifting scheme. **ECF No. 29**.

The Court found no Puerto Rico Supreme Court caselaw resolving this specific question and, although the parties made reference to judgments by the Puerto Rico Court of Appeals, neither party pointed to a decision available in the English language that would guide the Court through these uncharted waters. Furthermore, the Court was not able to locate records in the

English language of the Puerto Rico Legislature's debate or floor discussions of the bill that eventually became Law 4. Thus, the Court must rely on the statute's plaint text.

As a threshold matter, the Court notes that Section 1.2 of Law 4 states that "employees hired before the effective date of this act shall continue to enjoy the same rights and benefits they enjoyed before, as expressly provided in the Sections thereof." PR Law Ann. tit. 29, § 121a. Based on this language, plaintiff argues that even if this Court finds that Law 4 eliminated Law 80's "presumption" of wrongful discharge (*i.e.* without just cause) or burden shift, these changes are not applicable to him because he was working for defendant before the effective date of Law 4, January 26, 2017 (herein, "effective date"). **ECF No. 39**. The plain text of the statute states that "[e]mployees hired before the effective date of this act shall continue to enjoy the same rights and benefits they enjoyed before, as expressly provided in the sections thereof." P.R. Laws Ann. tit. 29, § 121a. Considering the fact that plaintiff was hired before the effective date of Law 4, absent Puerto Rico Supreme Court caselaw stating otherwise, the Court is bound to conclude that he enjoys the same rights and benefits he enjoyed before. Therefore, just as it was recently determined by a sister Court in this District, the Court "will conduct [its] analysis of Law 80 and Law 100 under the burden-shifting frameworks as they existed prior" to the enactment of Law 4. *Vázquez-Santiago v. Edwards Lifesciences Tech. Sarl*, LLC, 19-1089 (SCC), 2021 WL 3518808, at *5 (D.P.R. Aug. 10, 2021).

### C.      Law 80

"Law 80 operates through" a burden-shifting regime pursuant to which "plaintiff has the initial burden of showing that the employer actually or constructively fired her, and of alleging that her firing was not justified." *Villeneuve v. Avon Products, Inc.*, 919 F.3d 40, 47 (1st Cir. 2019)(citing *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 140 (1st Cir. 2017); *Álvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 28 (1st Cir. 1998)). The burden then shifts to the employer to show just cause for the firing. *Id.* However, by showing "just cause" the employers punts back to plaintiff the burden of proof to rebut the employer's showing. *Id.*

In this case, plaintiff has met his initial burden by showing that he was fired and alleging that it was because of his age.  **ECF No. 1-1**. The Court must then evaluate whether defendant meets its burden of showing just cause by a preponderance of the evidence. At this stage, defendant "need only demonstrate that it had a reasonable basis to believe that an employee has engaged in one of those actions that the law identifies as establishing such cause." *Pérez v. Horizon Lines, Inc.*, 804 F.3d 1, 9 (1st Cir. 2015). That is, "the employer's reasoned deliberation." *Id.* The First Circuit held that "just" is "one where an employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the business' operation." *Id.* Moreover, in the particular context of summary judgment under Law 80, the First Circuit has held that a "**perceived violation** suffices to establish that [the employer] did not terminate [the employee] on a whim, but rather for a sensible business-related

reason." *Id*. (quoting *Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 10 (1st Cir. 2007)(emphasis

added).

      In shouldering this burden, defendant has shown (and plaintiff admitted) that plaintiff's

actions in logging the time of completion of the rinsing step "minutes after" the fact constitutes

a violation of defendant's rules and regulations. As a matter of fact, plaintiff admits he "missed"

and "apologized." **ECF No. 30** ¶ 50. During his interview with the human resources department,

plaintiff admitted it was not "the right thing to do." **ECF No. 37-11** at 5. Human resources

personnel asked plaintiff what he was supposed to do in that situation, "[l]eave it blank and call

the supervisor," he answered. *Id*. Admittedly, he did not. Instead, according to undisputed

evidence, plaintiff broke the rules by failing to document the time it was when he finished

rinsing the bin, then violated protocol by documenting an entry minutes after the fact while he

was performing a different task of the process. To make matters worse, he did not inform his

supervisors.

      As a Senior IPT Operator, plaintiff had to adhere to and ensure compliance with GMPs,

GDPs, SOPs and safety standards. *Id*., ¶ 32; *id.,* ¶ 32. As a matter of fact, as part of his duties,

plaintiff also trained other or new pharmaceutical operators in the procedures and unitary

operations required for manufacturing procedures. *Id*., ¶ 31; *id.,* ¶ 31. Furthermore, the

Employee Handbook sets forth a non-exhaustive list of improper conduct, offenses and

violations that could result in corrective or disciplinary measures or immediate employment

termination, including: conduct that puts the integrity of defendant's products at risk, falsification or alteration of any Company document, noncompliance with assigned work, omission of job duties or responsibilities and errors due to negligence or carelessness, violation to established rules of GMPs (and GDPs), Good Clinical Practices and/or Laboratory Practices; and violations to Global Standards of Business Practices. *Id.***,** ¶ 35; *id.,* ¶ 35.

Plaintiff makes much of the fact that Form 3238 does not explicitly state that plaintiff had to write down the start and end time precisely at the time ("contemporaneously") he started and ended each task. *See* **ECF No. 30** ¶ 50. Contrary to plaintiff's generic objection as to Form 3238's lack of the term "contemporaneously," Form 3238 required plaintiff to "document the purified water start and end times." **ECF No. 37-9**. These requirements would serve no purpose if the operator could enter the start and end time of each step whenever he saw fit or, in plaintiff's case, when he "remembered" to do so by estimating the time it actually took him to perform the task. Moreover, the truth of the matter is that defendant's SOPs 01-122, **ECF No. 25-14** at 5, clearly states that "raw date must be contemporaneously recorded by permanent means."[15] Finally, the fact that the checklist does not contain the word "contemporaneously" is of no weight considering the fact that plaintiff did not log the time he finished rinsing the bin with purified water until after he moved on to the next step (*i.e.* drying the bin), which also required plaintiff to log the time of application of the Isopropyl Alcohol.

---

[15] "[T]he first time a numerical dta (sic) values/observations are recorded is considered raw data." **ECF No. 25-14** at 5.

As noted before, defendant need only demonstrate that it had a reasonable basis to believe that plaintiff has engaged in one of those actions that the law identified as establishing such cause. *See Pérez v. Horizon Lines, Inc.*, 804 F.3d at 9. All defendant needs to show is a "perceived violation," because the "termination need only be 'non-arbitrary' and bear 'some relationship to the business' operation." *García-García v. Costco Wholesale Corp.*, 878 F.3d 411, 420 (1st Cir. 2017)(quoting *Pérez v. Horizon Lines, Inc.*, 804 F.3d at 9). In this case, as defendant points out, plaintiff's conduct could fall under one or more of Law 80's preestablished categories of good cause. The Court agrees. Defendant has shown that plaintiff's conduct in backdating an entry could constitute a case of "failure to perform his or her work in an efficient manner, or ... doing it belatedly and negligently or in violation of quality standards." PR Laws Ann. tit. 29 § 185b(b). Therefore, the employer's actions in dismissing plaintiff were justified by a preponderance of the evidence.

Plaintiff tried, to no avail, to rebut the showing of "good cause" by raising several issues surrounding his dismissal. Among plaintiff's more salient arguments, he purports that the backdating incident was used as a pretext to dismiss him because of his age. In support, plaintiff asserts that his error was classified as a minor incident and had no major repercussions. Plaintiff also argues that defendant failed to follow the Employee Handbook during the investigation that ended up with his dismissal. **EFC Nos. 29, 42**. The Court will address each one in turn and

with a grain of salt considering plaintiff's blatant disregard of the requirements of Local Rule 56(c).

Via reply, defendant avers that most of plaintiff's arguments are based on a "quality" investigation as opposed to the investigation conducted by the human resources department. Reviewing plaintiff's references to the evidence, the Court agrees that all of plaintiff's arguments are based on defendant's quality investigation. Plaintiff's efforts to dismiss the importance of his misconduct are also unavailing. According to the evidence submitted, plaintiff's violation was deemed as a "minor deviation" only because Astra Rodríguez reported the violation, at which point defendant ordered the cleaning proceeding to be repeated by another operator in order to achieve satisfactory results under applicable regulations and SOPs. Admittedly, protocol required plaintiff to report to his superiors the fact that he forgot to enter the time in which he finished the rinsing process. **ECF No. 37-11** at 3, 5.

Moreover, plaintiff's misconduct must be evaluated in context. Defendant is a highly regulated company under strict regulatory scrutiny. Plaintiff admitted that defendant's employees have to comply with GMPs, GDPs, SOPs including SOPs 01-122, which requires contemporaneous entries of procedures such as the cleaning of the bin. Violations of these and other applicable regulations can result in criminal and civil liability as well as monetary sanctions against defendant. **ECF No. 25** ¶¶ 7-9.

Defendant also defends itself by explaining that there is no evidence suggesting that any of the decision-makers had information related to his prescriptions and medications at the time they made their decision to terminate the employment relationship with plaintiff. As to this point, defendant has proven that during plaintiff's interview with the human resources department, which took place a day after the incident, plaintiff never mentioned his alleged conversation with his superior about being on medications or that he felt unfit on October 25, 2017 due to medications. **ECF No. 37-11** at 5.[16] Defendant showed that plaintiff's medical certificate did not make reference to plaintiff taking any particular medication or their potential side effects that would render him unfit to perform his work. **ECF Nos. 25** ¶ 40; **ECF No. 30** ¶ 40. Indeed, the medical certificate states, without more, that plaintiff "will" report back to work on October 25, 2017. **ECF No. 37-8**. No restrictions or special indications were included. *Id.*

Even if the Court were to consider plaintiff's assertions about him not being "fit" to work on October 25, 2017 due to medications or that he told Group Leader Juan Resto about it,[17] plaintiff does not point to any evidence showing that the decision-makers knew about it before his dismissal. To the contrary, the evidence shows that the human resources department was not

---

[16] The evidence suggests that when asked by the human resources department about the reasons for his violation, plaintiff attributed it to, not to medication, but rather to being "lost" after being away from work "for a week." **ECF No. 37-11** at 5.

[17] As discussed before, plaintiff's statements in this regard are openly contradicted by his physician's orders. In any case, plaintiff stated in his deposition that he took Flowmax on October 25, 2017. However, he did not remember the other medication he was on the day of the incident.

informed by any of the interviewees (including plaintiff) about plaintiff's conversation with Group Leader Juan Resto or being on medications and feeling "unfit."[18]

What the evidence shows is that, when asked by the human resources department about the reasons for his misconduct, plaintiff attributed it to feeling "lost" after being away from work "for a week." **ECF No. 37-11** at 5. Nothing in the notes taken during plaintiff's interview suggests that plaintiff informed the human resources department about the medications he was on or having requested help during the day of the incident. Moreover, the notes taken during Astra Rodríguez's and Marilyn Ortiz's interviews are also silent as to any indication in that regard. Thus, defendant has shown that it made its decision to dismiss plaintiff not because of whim, but rather a "perceived violation" and for a business-related reason. *García-García v. Costco Wholesale Corp.,* 878 F.3d at 420.

Defendant also demonstrated that the Employee Handbook's Rules of Conduct establishes that employees' conduct must be responsible, professional, honest and in accordance with defendant's policies. **ECF No. 37-2** at 66. Such rules, according to the Employee Handbook, are examples of actions or conduct that may result in corrective or disciplinary action, "including the termination of employment." *Id.*, at 68. Plaintiff's conduct could fall under more than one of the examples outlined in the defendant's Employee Handbook, including falsification or

---

[18] Even if the Court construed these allegations in the light most favorable to plaintiff and, solely for argument purposes, the Court were to validate plaintiff's statements, the truth remains that after having missed doing the entry, he subsequently engaged in egregious conduct: to backdate the record and not to report it to the supervisor to enable corrective action.

alteration of a company document, evading the corresponding responsibilities of his position, ignoring written instructions, violating the rules established by defendant, noncompliance with assigned work, neglecting duties, errors or mistakes due to negligence or carelessness, omitting information, and violation of the established GMPs. *Id*. The Employee Handbook clearly states that the "final decision regarding the appropriate level of discipline to be applied will be based both on the type of violation and on other relevant facts." *Id*., at 68. As to the discretion in determining the disciplinary measure, defendant reserved the right to impose a sanction "according to the severity of the offenses, among other factors, for which reason that order[19] will not necessarily be followed in every case." *Id*.

Finally, plaintiff had been warned on five previous occasion that future violations would result in disciplinary actions including termination. **ECF No. 24** ¶ 93. Thus, even if the Court accepted that the employee's manual did not include a clear-cut guideline as to the proper disciplinary action, "the evidence shows that he was given clear notice that failure [to abide by the employer's regulations] was not acceptable." *Adamson v. Walgreens Co.*, 750 F.3d 73, 81 (1st Cir. 2014). Hence, plaintiff's bid faulting defendant for not following the Employee Handbook and questioning defendant's internal investigation is baseless and contrary to the evidence.

As noted by the First Circuit, the Puerto Rico Supreme Court has declined construing Law 80 "to impose statutory penalties [even if] an employer makes an error of judgment, since such

---

[19] "Verbal warning, written warning, suspension, termination of employment." **ECF No. 37-2** at 69.

a rigid reading (which would seem to require courts to regularly review the merits of companies' internal investigations) would go beyond the letter and spirit of the law." *Pérez v. Horizon Lines, Inc.*, 804 F.3d at 9-10 (quoting *Narváez v. Chase Manhattan Bank*, 120 P.R. Dec. 731, 20 P.R. Offic. Trans. 766, 773, 120 D.P.R. 731 (1988)(internal quotation marks omitted)). As restated recently, the First Circuit has held that judges "do not serve as a super personnel department, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Villeneuve v. Avon Products, Inc.*, 919 F.3d at 48 (1st Cir. 2019)(quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)(cleaned up). Thus, this Court is not in the business of second guessing the rationality of defendant's business decisions.

However, this determination does not end the analysis because a favorable finding for plaintiff with respect to his age discrimination claims "would necessarily make [plaintiff]'s termination unjustified under Law 80" on the ground of discrimination. *Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico Inc.*, 999 F.3d 37 (2021).

### C.     Law 100

Similar to ADEA, Puerto Rico law prohibits discrimination based on age via Law 100. PR. Laws Ann. tit. 29 § 146. It "provides a cause[ ] of action in favor of those persons who suffer discrimination in their employment because of their age. However, [the statutes] differ with regard to the burden[s] of proof that they impose upon the employer and the employee," under certain circumstances. *Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 27–29

(1st Cir. 1998)(citing *Soto v. Hotel Caribe Hilton,* 137 P.R. Dec. 294 (1994), 1994 WL 909663, at 4). Much like the burden-shifting scheme of Law 80, Law 100, too, entitles the employee to a rebuttable "presumption" that the employer has discriminated illegally unless the employer can show that the discharge was justified. *Id.,* (quoting P.R. Laws Ann. tit. 29, § 148). Importantly, however, this "presumption" depends on the employer's lack of "just cause" for the adverse employment action. Because Law 100 was not enacted with a definition of "just cause," the Puerto Rico Supreme Court looked and applied the definition contained in analogous statutes, particularly Law 80. *Báez García v. Cooper Laboratories, Inc.,* 120 P.R. Dec. 145, 155 (1987).

The presumption and burden-shifting scheme, thus, will not be triggered "if the employer proves that the discharge was justified." *Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.,* 152 F.3d at 28 (citing P.R. Laws Ann. tit. 29 § 148.) In such scenario, "the burden of proof on the ultimate issue of discrimination remains with the plaintiff," who then "must prove that, even if the dismissal was justified, the defendant nevertheless violated Law 100 because the dismissal was motivated by discriminatory animus instead of or in addition to the legitimate reasons for dismissal." *Id.*

Here, as discussed before, defendant met its burden under Law 80 in connection with plaintiff's claims of a faulty investigation leading up to his dismissal. Plaintiff thus presents two additional arguments in connection with his discrimination claims, which he contends are enough to defeat summary judgment because they are supported by sufficient "evidence to

create a genuine issue of material facts as to whether the proffered reason for his termination was pretextual… [and] intended to cover up… age discrimination." *Adamson v. Walgreens Co.*, 750 F.3d at 79. First, plaintiff contends that two younger employees, who incurred in "major deviations" or worst violations than his, were treated more favorably than he was. **ECF No. 29** at 21-22. Specifically, he claims that on June 2017, Luis Rodríguez "incurred in a quality deviation that impacted a batch" of defendant's products, which "entailed a loss of [] approximately one million dollars." *Id.*, at 21. Nevertheless, Luis Rodríguez received a written warning for his "major deviation." *Id*. According to the written warning issued against Luis Rodríguez, defendant's "Progressive Disciplinary program… establishes that a major deviation in a twelve (12) month period entails a written warning."[20] *Id.*, at 22.

Likewise, plaintiff contends that on July 5, 2016, María Ortiz "added information to a manufacturing record which was not verifiable, nor was it made in real time" (four days after). *Id.*, at 22. Although her offense was classified as a "serious" one, she only received a three-day suspension without pay. *Id*.

---

[20] Although the Court was curious about this statement which could have had a significant impact in the case, plaintiff did not make reference to any document on the record, aside from Luis Rodríguez's written warning at **ECF No. 37-17**, that would show that defendant's rules or "progressive disciplinary program" establishes that the penalty for a major deviation in 12 months is always or regularly a written warning. Contrary to what this statement might suggest, as discussed before, the Employee Handbook clearly states that the employer need not necessarily follow the progressive discipline order in every case. **ECF No. 37-2** at 66. Devoid of any reference to evidence showing a practice or a rule establishing so, the Court is left with no choice but to circle back to the conclusion that Luis Rodríguez's case cannot be compared with plaintiff's case.

Defendant, on the other hand, made a very compelling case suggesting that these employees are neither similarly situated nor could their actions be deemed roughly equivalent to plaintiff's violations. In this regard, the First Circuit held, for this kind of evidence (*i.e.* disparate treatment) to be "probative of discriminatory animus, a claim of disparate treatment must rest on proof that the proposed analogue is similarly situated in material respects". *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 451 (1st Cir. 2009)(quoting *Perkins v. Brigham & Women's Hosp.* 78 F.3d 747, 751-752 (1st Cir. 1996). Accordingly, the Court must evaluate "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. While an exact correlation is not necessary, the proponent must demonstrate that the cases are fair congeners." *Id.*

First of all, defendant submitted evidence in the form of an affidavit (proper for the analysis at hand)[21] clarifying that Luis Rodríguez was 43 years old at the time of his misconduct. Although an Operator, he occupied a position lower than plaintiff's "Senior" position. Even if significantly worse in terms of monetary impact, Luis Rodríguez's "deviation" was of a different classification under defendant's internal guidelines. To wit, while plaintiff's violation was considered as a "Human Error-Decision Gap," Luis Rodríguez's conduct was classified as a

---

[21] Plaintiff also relies on the affidavit to support his proposed statements. Even a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions." *Levine-Diaz v. Humana Health Care*, 990 F. Supp. 2d 133, 140 (D.P.R. 2014)(quoting *Malavé–Torres v. Cusido*, 919 F.Supp.2d, 198, 204 (D.P.R. 2013)(citing *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997)("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."))

"Human Error-Attention Gap."[22] Moreover, Luis Rodríguez's misconduct took place on his second month of employment with defendant and was his first and only disciplinary action.

Defendant argues that the same goes for María Ortiz. For starters, she was 46 years old at the time she was suspended and was not even an IPT Operator at defendant's facilities. Although her misconduct was classified as "serious," her record reflects she only has one disciplinary action in her records with defendant. In addition, her violation was classified by defendant as a different kind of violation, "Human-Error(Application)".

The First Circuit has considered several factors in determining disparate treatment: history of disciplinary actions, seriousness of the misconduct,[23] "reasonableness,"[24] and whether the "distinctions are [] meaningless."[25] Looking at the evidence objectively, the Court finds that a prudent person would not "think them roughly equivalent and the protagonists [not] similarly situated" either. *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d at 451.

Indeed, plaintiff's disciplinary history[26] far out-runs the other two employees. Even if some of the considerations weigh in plaintiff's favor, such as the seriousness of the other

---

[22] A "desiccant bag was not removed from some of the drums of material during the transfer process." **ECF No. 37-17** at 1.

[23] *See Perkins v. Brigham & Women's Hosp.* 78 F.3d at 751.

[24] *Ray v Ropes & Gray LLP*, 799 F.3d 99 (2015)(quoting *Conward v. Cambridge Sch. Comm.*, 177 F.3d 12, 20 (1st Cir. 1999).

[25] *See Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d at 451-452.

[26] Plaintiff was first admonished on May 16, 2003 due to violations to GMPs, manufacturing regulations, and SOPs *Id.*, ¶ 92; *id.*, ¶ 92. He then received a written admonishment on April 29, 2005 based on his violations to the employer's manufacturing instructions, as established in the company's manufacturing procedures and registrations, the GMP, manufacturing regulations and the Employee Handbook. *Id.*, ¶ 91; *id.*, ¶ 91. Plaintiff was again verbally admonished on March 3, 2008 due to "deviations" that resulted from two incidents in which he

offenses,[27] plaintiff cannot get around the fact that this is his sixth violation which required disciplinary action from his employer. *See Adamson v. Walgreens Co.*, 750 F.3d at 79 (plaintiff "has not provided any example of a younger employee who had a second incident of misconduct… [plaintiff's] second infraction renders him **materially different from these other employees**, his attempt to show disparate treatment necessarily fails"(emphasis added); *Adamson v. Walgreens Co.*, 750 F.3d 73, 82 (1st Cir. 2014); *Perkins v. Brigham & Women's Hosp.* 78 F.3d at 751 (the other employee "did not have a history of repeated disciplinary actions over a ten-year period").

Plaintiff final argument relies on statistics. "Valid statistical evidence may play a helpful role even in disparate treatment cases, but only if it tends to prove the discriminatory intent of the decision makers involved." *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003). "That often will be difficult." *Id.*, (citing *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993). "[S]tatistical evidence of a company's general hiring patterns, although relevant, carries less probative weight, and in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015)(quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d at 848 (internal quotation marks omitted).

---

deviated from the GMPs, GDPs, manufacturing regulations and SOPs. *Id.*, ¶ 90; *id.*, ¶ 90. On May 29, 2015, plaintiff received a "Verbal Warning-Human Errors" based on a sequence of four incidences he incurred during the manufacturing production of product called Janumet XR. *Id.*, ¶ 89; *id.*, ¶ 89. On July 22, 2015, plaintiff received yet another written admonishment based on his deviations to GMPs, manufacturing records and regulations and operating procedures in the manufacturing process of Janumet XR. *Id.*, ¶ 88; *id.*, ¶ 88.

[27] The seriousness of the other violations loses relevance when put in context. Luis Rodríguez's violation happened on his second month working for defendant and was only his first violation. Similarly. María Ortiz only has one disciplinary action on her record. A "prudent person" would not deem these differences "meaningless." *See Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d at 451-452.

Mindful of statistical evidence's inherent limitations, the Court now addresses plaintiff's arguments. Plaintiff plainly contends that "the population of employees over forty (40) years of age has decreased despite the fact that the number of these employees increase on a yearly basis." **ECF No. 23** at 23.[28] Yet, absolutely nothing on the record supports the basic premise of plaintiff's argument: the number of people over 40 years old increase on a yearly basis. Moreover, even if that were the case, nothing on the records suggests that people over 40 years of age apply for a job with defendant at the same or comparable rates as younger ones do. This flaw--common to many statistical arguments-- was noticed and emphasized by the First Circuit many years ago. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d at 848 ("the fact that recently hired [employees] are younger than [plaintiff] is not necessarily evidence of discriminatory intent, but may simply reflect a younger available work force."); *see Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 943 (6th Cir. 1987)(statistics lacked information as to whether or not "qualified older employees were available or applied for those jobs.")

Plaintiff adds, "from the year 2016, from a 66% percent of IPT Operators… over forty (40) years" decreased to 41% "by the year 2018, which is the date of Plaintiff termination." **ECF No. 29** at 23.  Plaintiff also point to numbers showing that it further decreased to 35% by 2020. *Id*. According to plaintiff, this shows that defendant "systemically[] dismissed older workers to replace them with younger ones… plaintiff's termination responded to [defendant]'s

---

[28] Plaintiff made a general reference to his additional SUMF's at **ECF No. 30,** ¶ 100, which, in turn, makes reference to defendant's Exhibits A, W.

discriminatory age-based animus." *Id.*, at 26. Again, plaintiff failed to purport and evince that this trend continues even though the work force available to defendant include a substantial number of people 40 years old or older in comparison to younger available hands. Aside from the statistical issues and gaps in this argument, the number plaintiff points to do not "tend[] to prove the discriminatory intent of the decision makers involved." *Hillstrom v. Best W. TLC Hotel*, 354 F.3d at 32. After all, under disparate treatment arguments, the focus is "less whether a pattern of discrimination existed and more how a particular individual was treated, and why." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015)(quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d at 848 (internal quotation marks omitted). Nothing in the numbers proposed by plaintiff, even if substantiated by the record, shows discriminatory intent or how plaintiff was treated or why.

IV.   **Conclusion**

For all the above, defendant's motion for summary judgment at **ECF No. 24** is **GRANTED**. Thus, plaintiff's claims are dismissed with prejudice. Clerk of Court is to enter judgment accordingly.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of September 2021.

S/AIDA M. DELGADO-COLÓN
**United States District Judge**